UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

```
DINAH L. HENLEY,                    )
                                    )
            Plaintiff              )
                                    )
      v.                            )  Case No. 2:03 cv 236
                                    )
UNITED STATES STEEL CORPORATION,)
a Delaware Corporation doing       )
business in Indiana, and UNITED    )
STEEL WORKERS OF AMERICA,          )
DISTRICT 7, SUB DISTRICT 5,        )
                                    )
            Defendants             )
```

## OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the defendant, United States Steel Corporation ("U.S. Steel") on October 15, 2004, and the Motion for Summary Judgment filed by the defendant, United Steelworkers of America ("Steelworkers") on October 6, 2004.  For the reasons set forth below, these motions are **GRANTED.**

## Background

Dinah Henley was a laborer for U.S. Steel from March 6, 2000 until August 7, 2000.  (Dinah Henley Dep. pp. 14-17) During Henley's employment, Steelworkers represented her through Local Union 1014.  (Henley Dep. p. 33) A collective bargaining agreement ("CBA") effective August 1, 1999, governed the parties during the events giving rise to this case.  (U.S. Steel Supp. MSJ, App. Exh. E)

On August 7, 2000, Henley and her husband had an altercation in which Henley stabbed her husband in the chest, killing him.

(Henley Dep. pp. 20-21) On August 17, 2000, the police arrested Henley for the murder of her husband. (Henley Dep. pp. 21-22) Henley remained in jail until June 3, 2002, when she was released on bail. (Henley Dep. p. 23) The charges against Henley ultimately were dismissed on December 13, 2002, because, according to Henley, the prosecutor determined that Henley had acted in self defense and that police officers had fabricated evidence against her. (Henley Dep. pp. 20-21, 26; Brief Opp. MSJ, Exh. 2)

On August 18, 2000, the day following her arrest, Henley notified Linda Woods in the U.S. Steel employment office that she was incarcerated and would not be able to report for work. (Henley Dep. pp. 26-27) During her time in jail, Henley did not have any further contact with U.S. Steel, and U.S. Steel assigned her a Code 640 employee classification, meaning "unavailable for work due to arrest." (Henley Dep. pp. 26-28; Ron Brown Dep. pp. 18-19)

While incarcerated, Henley was diagnosed with breast cancer. (Henley Dep. p. 29) Henley testified that upon her release on June 3, 2002, she once again contacted Woods, informed Woods that she would like to return to work, and inquired about her benefits in light of her breast cancer diagnosis. (Henley Dep. pp. 28-29, 36) Woods told Henley that she would look into her benefits but to contact her grievance committeeman regarding her job. (Henley Dep. pp. 31, 36) On June 6, 2002, U.S. Steel suspended Henley because of her unjustified extended absence from work while she

was in jail.  (U.S. Steel Supp. MSJ, App. 1, Pltf's Exh. 16;
Brown Dep. pp. 22-23)

Also in the early part of June 2002, Henley began chemo-
therapy.  (Brief Opp. MSJ, Exh. 4) On June 7, 2002, Henley
obtained a doctor's note indicating that her treatment plan would
include chemotherapy, surgery, and radiation therapy and would
last approximately 18 months.  (Brief Opp. MSJ, Exh. 5, $\partial$ 1)
Although the chemotherapy made Henley nauseated and would cause
her to vomit four to five times a day, she claims that she could
have worked an eight hour shift at the plant had she received a
few additional breaks during the day.  (Brief Opp. MSJ, Exh. 4, $\partial$
3) Furthermore, Henley claims that her chemotherapy "stopped
[her] from doing a number of daily tasks" and that by working an
eight hour shift she would have been "too fatigued to do house-
work or have any recreation."  (Brief Opp. MSJ, Exh. 4, $\partial$ 3)
However, Henley testified that she never requested that U.S.
Steel provide her with an accommodation for a disability.
(Henley Dep. pp. 84-85) In addition, Henley testified that she
does not claim that U.S. Steel perceived her as being disabled.
(Henley Dep. p. 85)

The CBA between U.S. Steel and Steelworkers establishes a
procedure for suspensions and discharges.  (U.S. Steel Supp. MSJ,
App. B, pp. 59-63) According to this procedure, an employee may
not be discharged peremptorily.  Rather, before discharging an
employee, U.S. Steel initially must suspend the employee for not
more than five calendar days and give the employee written notice

3

of the suspension.  (U.S. Steel Supp. MSJ, App. B, CBA, p. 60)
During the five day suspension, the employee may request a
hearing pursuant to Section 8B of the CBA ("8B hearing") with a
representative of U.S. Steel.  (U.S. Steel Supp. MSJ, App. B,
CBA, p. 60) If an employee is incarcerated, U.S. Steel's policy
is to wait until the employee is released from jail before
issuing a suspension to ensure that the employee who requests an
8B hearing during the suspension is able to attend the hearing.
(U.S. Steel Supp. MSJ, p. 5; Brown Dep. p. 23) At the 8B hearing,
the employee may choose to be assisted by a grievance committee-
man, and both parties must have the facts made available to them.
(U.S. Steel Supp. MSJ, App. B, CBA, p. 60)

    After the five suspension days have ended, regardless of
whether the employee requested a hearing, U.S. Steel "may con-
clude whether the suspension shall be affirmed, modified, ex-
tended, revoked, or converted to a discharge." (U.S. Steel Supp.
MSJ, App. B, CBA, p. 60) After this decision is made, the em-
ployee has five calendar days to file a grievance pursuant to
Section 6 of the CBA.  This filing triggers Step 2 of the griev-
ance procedure in which the grievance committeeman, the plant
general manager, and the grievant (if invited by the grievance
committeeman) participate in a "Step 2 meeting" to discuss the
grievance.  (U.S. Steel Supp. MSJ, App. B, CBA, pp. 41-43, 60-61)
The general manager must provide an answer to the grievance in
writing within ten days of the Step 2 meeting.  (U.S. Steel Supp.
MSJ, App. B, CBA, p. 42) If the grievance is not settled in Step

2, a Step 3 meeting is held pursuant to Section 6 of the CBA.  A representative of U.S. Steel with the authority to settle and a representative of the International Union who has the authority to settle, withdraw, or appeal the grievance, attend the Step 3 meeting.  (U.S. Steel Supp. MSJ, App. B, CBA, pp. 43-44)

Billy Gray was Henley's grievance committeeman at the time of Henley's release from jail.  (Henley Dep. p. 33; Billy Gray Dep. p. 5) Some time in June, Gray received a copy of Henley's June 6, 2002 suspension.  (Gray Dep. pp. 4-6) Henley contacted Gray on July 5, 2002, and several times thereafter.  (Henley Dep. pp. 32-43, 57; Gray Dep. p. 9) In one conversation, Henley told Gray that she had breast cancer but wanted to return to work. (Gray Dep. pp. 12-13; Henley Dep. p. 36) Gray informed Henley that she needed to get a doctor's note saying that she could return to work, which she obtained on July 8, 2002.  (Henley Dep. pp. 109-10; Gray Dep. p. 13)

Although Henley failed to request a hearing within five days of her June 6, 2002 suspension, Gray was able to schedule an 8B hearing on July 11, 2002, which he, Henley, and several U.S. Steel representatives attended.  (Henley Dep. p. 125; Gray Dep. pp. 10-11) At the hearing, Gray presented information regarding Henley's incarceration from August 18, 2000 to June 2, 2002, and a doctor's note indicating that she would have been able to work from June 3 to July 8, 2002.[1]  (Gray Dep. p. 16) Gray testified

---

[1] Although Gray alludes to the supporting documentation in his deposi-
tion, the only doctor note provided in the record dated early enough (June 7,
2002) to be proof Henley could work during the time period of June 3 to July

that the representatives of U.S. Steel responded to the informa-
tion by discharging Henley on the basis that her extended absence
was unjustified.  (Gray Dep. pp. 14-15)  To avoid confusion, the
representatives determined that Henley's discharge was to be
effective that day, July 11, 2002.  (Gray Dep. pp. 14-15)

     Henley testified that at the time she was discharged, she
was not disabled.  (Henley Dep. pp. 41-42, 57, 83; Gray Dep. pp.
14-15) Henley also testified that she does not have any evidence
that her discharge was motivated by her breast cancer diagnosis.
(Henley Dep. p. 85)

     After the 8B meeting, Gray advised Henley to go to the union
hall the next day and sign a complaint form.  (Gray Dep. p. 19)
He also called the union hall that day and verified with the
secretary that Henley had signed the correct form.  (Gray Dep. p.
19) Consequently, Henley, Chairman of the Grievance Committee Pat
Williford, and U.S. Steel Labor Relations Representative Larry
Koch attended a Step 2 meeting on July 25, 2002.  (U.S. Steel
Supp. MSJ, App. I; Henley Dep. pp. 65, 125)

     The Step 2 meeting minutes indicate that during the meeting,
U.S. Steel cited USS-28,906, a binding arbitration case in which
U.S. Steel was justified in discharging an employee because of
the employee's incarceration, in support of its position that
Henley was discharged for proper cause.  (U.S. Steel Supp. MSJ,
App. I) In that case, the arbitrator found that discharge due to

_____

8, 2002 merely laid out Henley's treatment plan.  (Pltf. Exh. 5) The only
doctor note in the record explicitly indicating she could return to work is
dated July 8, 2002.

incarceration was justified, even though the employee never was convicted of a crime, after considering (1) the reason for the incarceration, (2) the length of the incarceration, (3) the impact of the absence on operations, (4) the length of employee's service, and (5) the quality of the employee's work record. (U.S. Steel Supp. MSJ, App. I) The minutes further indicate that pursuant to USS-28,906, U.S. Steel determined that firing Henley was justified primarily because she had been a U.S. Steel employee for only five months prior to her incarceration, which had extended nearly two years.  (U.S. Steel Supp. MSJ, App. I; Pltf Exh. 9, part d)

After the meeting, Williford told Henley she would contact her, which Williford did the next day.  (Henley Dep. pp. 69-70) In their conversation, Williford described to Henley the process for taking her case to arbitration.  (Henley Dep. p. 70) Henley testified that she never heard anything further from Williford after that conversation, although she left messages for Williford.  (Henley Dep. p. 71)

After another union employee told Henley that she should contact Alexander Jacque, a Staff Representative of the Steelworkers who serves as the representative and advocate in arbitration cases, Henley set up an appointment with Jacque.  (Henley Dep. pp. 71, 74-75; Steelworker's Supp. MSJ, Exh. 6, $\partial\partial$ 1, 4) Henley testified that upon meeting Jacque for the first time, he commented to her, "Well, your hair looks nice," when at the time she had no hair.  (Henley Dep. p. 75) She testified that she

7

asked him if he knew that she had breast cancer and he responded
that he did not.  (Henley Dep. p. 75)  Henley testified that she
asked him if he had read her file and that he responded, "what
file?"  (Henley Dep. p. 75)  She testified that she told him that
her file indicated that she had a grievance against U.S. Steel
for misstating the reason she was fired.  (Henley Dep. p. 75)
Because he did not recall reading the file, he set up an appoint-
ment to meet with her the next week so that he could review her
file before discussing her case with her.  (Henley Dep. p. 76)

The next week Jacque and Henley talked about her case, but
they never got into the details of her criminal case.  (Henley
Dep. pp. 77-78)  Henley testified that she asked Jacque why he was
not planning to take her case to arbitration, and he told her
that he needed to look into her case and that he had a lot of
"stuff" to do.  (Henley Dep. p. 78)  She then asked him again,
"Well, do you know that I had cancer?" and he told her he could
no longer speak to her about the situation.  (Henley Dep. p. 78)
Regardless of his comment about her lack of hair, Henley testi-
fied that she does not believe that Jacque has any animosity
toward her.  (Henley Dep. p. 138)

Jacque attended a Step 3 meeting on December 11, 2002 with
Ronald Brown, U.S. Steel's Step 3 Representative.  (Aff. of
Alexander Jacque, Steelworkers Exh. 6, $\partial$ 16)  After this meeting,
Jacque reviewed the USS-28,906 decision on which U.S. Steel
relied to discharge Henley.  (Jacque Aff., Steelworkers Exh. 6,
$\partial\partial$ 17-18; Steelworkers Exh. 7)  In light of that case and his

8

inability to find any contrary Board of Arbitration Awards that
would support Henley's grievance, Jacque determined that he would
not be successful in arbitrating Henley's grievance.  (Jacque
Aff., Steelworkers Exh. 6, $\partial\partial$ 19-20) Consequently, on December
27, 2002, he sent Henley the letter notifying her that Steelwork-
ers would not take her case to arbitration.  (Jacque Aff.,
Steelworkers Exh. 6, $\partial$ 23)

On February 24, 2003, Henley filed a Charge of Discrimina-
tion with the Equal Employment Opportunity Commissions ("EEOC")
in which she claimed that U.S. Steel had discriminated against
her based on disability when it discharged her for her extended
absence.  (Brief Opp. MSJ, App. Exh. 10) She did not file a claim
with the EEOC against the Steelworkers.  (Henley Dep. p. 101)
Henley received a Dismissal and Notice of Rights letter from the
EEOC on May 8, 2003.  (Brief Opp. MSJ, App. Exh. 10) On June 16,
2003, Henley filed a complaint in this court against U.S. Steel
and Steelworkers pursuant to the Americans with Disabilities Act,
22 U.S.C. ß12101 *et. seq.*, and under the Labor Management Rela-
tions Act ß301, 29 U.S.C. ß185(a).

<u>Discussion</u>

According to Henley, the basis of her disability discrimina-
tion claim is that U.S. Steel held her job open during the time
she was in prison and then as soon as she as released and in-
formed U.S. Steel that she had cancer, U.S. Steel took discipli-
nary actions against her. (Henley Dep. p. 81) In pursuit of this
theory, Henley raises two claims.  The first claim is against

U.S. Steel under the Americans with Disabilities Act ("ADA") for disability discrimination stemming from her cancer diagnosis, and the second is against U.S. Steel and the Steelworkers under Section 301 of the Labor Management Relations Act ("LMRA") for wrongful discharge.

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986); *Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004); *Branham v. Snow*, 392 F.3d 896, 901 (7th Cir. 2004); *Windle v. City of Marion, Indiana*, 321 F.3d 658, 660-61 (7th Cir. 2003), *cert. denied*, 540 U.S. 873, 124 S.Ct. 873, 157 L.Ed.2d 133 (2003).  The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); *Lawrence*, 391 F.3d at 841. A fact is material if it is outcome determinative under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Lawrence*, 391 F.3d at 841; *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004); *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003).  Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court

10

reveals a good faith dispute as to inferences to be drawn from those facts. *Spiegula v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004); *Hines v. British Steel Corporation*, 907 F.2d 726, 728 (7th Cir. 1990). Finally, summary judgment "will not be defeated simply because motive or intent are involved." *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 148 (7th Cir. 1994). *See also Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 346 (7th Cir. 1997); *United Association of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986)

*See also, Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-22

(2000) (setting out the standard for a directed verdict); *Celotex Corp.*, 477 U.S. at 322-323, 106 S.Ct. at 2553; *Branham*, 392 F.3d at 901; *Lawrence*, 391 F.3d at 841; *Hottenroth*, 388 F.3d at 1027 (stating that a genuine issue is one on which "a reasonable fact finder could find for the nonmoving party"); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003) (stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party).

As a preliminary matter, both U.S. Steel and the Steelworkers object to Henley's "Fact/Statement of Genuine Issues" because it does not comply with Local Rule 56.1. Under Local Rule 56.1(a), any party opposing the motion for summary judgment must include a "Statement of Genuine Issues" supported by admissible evidence which sets forth "all material facts as to which it is contended there exists a genuine issue necessary to be litigated." Local Rule 56.1(b) instructs the court to assume that all facts claimed by the moving party that are not controverted in the "Statement of Genuine Issues" have been admitted. While district courts often strictly enforce Local Rule 56.1(a), a district court's decision to enforce or relax the requirements of the local rule is reviewed under an abuse of discretion standard. *Cichon v. Exelon Generation Company, L.L.C.*, 401 F.3d 803, 810 (7th Cir. 2005); *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004).

Although the defendants point to Henley's failure to follow Local Rule 56.1, neither defendant filed a motion to strike Henley's brief.  Additionally, it would be a waste of time and judicial resources to require Henley to conform to the Local Rule at this date.  A review of the briefs reveals that the parties assert different, but not conflicting, facts.  In addition, many of the facts asserted by Henley simply are not relevant to this case.  For example, Henley devotes a great deal of her fact statement to the criminal case underlying her incarceration.  In any event, Henley carries the burden of setting forth all material facts for which there is a genuine issue necessary to be litigated.  Thus, the court will assume that all relevant facts that are adequately supported by admissible evidence presented by the defendants are true unless Henley, in her "Facts/Statement of Genuine Issues" demonstrates a contradiction.

### A.   Americans With Disabilities Act Claim

Although not clearly articulated in the complaint, Henley's claim under the ADA is presumably only against U.S. Steel, as the Dismissal and Notice of Rights letter she received from the EEOC was based on a charge she brought only against U.S. Steel and not Steelworkers.  The parties do not brief the issue of whether Henley is able to bring an ADA claim regardless of the CBA. However, the court notes that the CBA does not waive Henley's right to sue under the ADA because the ADA creates an independent statutory right, whereas the CBA covers contractual rights negotiated by the union.  *See **Wright v. Universal Maritime***

*Service Corporation*, 525 U.S. 70, 77, 79, 119 S.Ct. 391, 395-96, 142 L.Ed.2d 361 (1998); *Alexander v. Gardner-Denver Company*, 415 U.S. 36, 49-50, 94 S.Ct. 1011, 1020, 39 L.Ed.2d 147 (1974); *Tice v. American Airlines, Inc.*, 288 F.3d 313, 317 (7th Cir. 2002). *But see* *Gilmer v. Interstate/Johnson Lane Corporation*, 500 U.S. 20, 23, 26, 111 S.Ct. 1647, 1650, 1652, 114 L.Ed.2d 26 (1991).

The ADA forbids all covered employers from "discriminating against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. ß12112(a).  *See also* *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004); *Byrne v. Avon Products, Inc.*, 328 F.3d 379, 380 (7th Cir. 2003), *cert. denied,* 540 U.S. 881, 124 S.Ct. 327, 157 L.Ed.2d 147 (2003); *Bekker v. Human Health Plan, Incorporated*, 229 F.3d 662, 669 (7th Cir. 2000).  It is undisputed that U.S. Steel is a covered employer. (U.S. Steel Brief Supp. MSJ, p. 8, n.3) Thus, Henley can bring an ADA claim against U.S. Steel either by the direct method of proof or by the indirect method of proof.  *Buie*, 366 F.3d at 503; *Robin v. ESPO Engineering Corporation*, 200 F.3d 1081, 1089-92 (7th Cir. 2000).  Henley does not raise a direct method argument, asserting only that U.S. Steel violated the ADA based on the indirect method of proof.  (Brief Opp. MSJ, pp. 15-18)

14

In order to prove a violation of the ADA using the indirect method of proof, Henley first must establish a prima facie case of discrimination.  *See* *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 S.Ct. 668 (1973); *Buie*, 366 F.3d at 503; *Leffel v. Valley Financial Services*, 113 F.3d 787, 792 (7th Cir. 1997); *DeLuca v. Winder Industries, Inc.*, 53 F.3d 793, 797 (7th Cir. 1995).  Thus, Henley must show that (1) she is disabled under the ADA, (2) she is qualified to perform the essential functions of her job with or without reasonable accommodations, and (3) she has suffered from an adverse employment decision because of her disability.  *Buie*, 366 F.3d at 503; *Dyke v. O'Neal Steel, Inc.*, 327 F.3d 628, 631 (7th Cir. 2003); *Dvorak v. Mostardi Platt Associates, Inc.*, 289 F.3d 479, 483 (7th Cir. 2002).  If Henley establishes a prima facie case, the burden of production shifts to U.S. Steel to articulate a non-discriminatory motive for the termination.  *McDonnell Douglas*, 411 U.S. at 802-03, 93 S.Ct. at 1824; *Buie*, 366 F.3d at 503; *Dvorak*, 289 F.3d at 485.  If U.S. Steel is able to articulate a non-discriminatory reason for the termination, the burden shifts back to Henley to prove by a preponderance of the evidence that the reason offered by U.S. Steel is a pretext for intentional discrimination.  *Buie*, 366 F.3d at 503, *Dvorak*, 289 F.3d at 485. Despite this shifting burden of production, the burden of proof ultimately remains with Henley.  *Dvorak*, 289 F.3d at 485. However, in alleging discrimination, Henley has a lesser burden because she is proceeding on summary judgment motion.  *Anderson*

15

*v. Baxter Healthcare Corp.*, 13 F.3d 1120 (7th Cir. 1994)
("*McDonnell Douglas* . . . speak[s] to the burden the plaintiff
bears at trial. However, for summary judgment purposes, the
nonmoving party, in this case the plaintiff, has a lesser burden.
He must only 'produce evidence from which a rational fact-finder
could infer that the company lied' about its proffered reasons
for dismissal."). *See also Weisbrot v. Medical College of
Wisconsin*, 79 F.3d 677, 682 (7th Cir. 1996); *Perdomo v. Browner*,
67 F.3d 140, 145 (7th Cir. 1995).

In establishing a prima facie case, Henley first must prove
that she is disabled under the ADA. Disability under the ADA is
defined as "(A) a physical or mental impairment that substantial-
ly limits one or more of the major life activities of such
individual; (B) a record of such an impairment; or (C) being
regarded as having such an impairment." 42 U.S.C. ß12102(2)
(2000). *See also Toyota Motor Manufacturing, Kentucky, Inc. v.
Williams*, 534 U.S. 184, 193, 122 S.Ct. 681, 689, 151 L.Ed.2d 615
(2002); *Dyke*, 327 F.3d at 632. Under this definition, coverage
extends to people who have recovered from an impairment that
substantially limits a major life activity, such as cancer or
coronary disease, but who "remain vulnerable to the fears and
stereotypes of their employers." 42 U.S.C. ß12102(2)(B)(2000).
*See also Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 509
(7th Cir. 1998). Coverage also extends to people who never have
had a debilitating impairment but who are incorrectly perceived
as having a debilitating impairment. 42 U.S.C. ß12102(2)(B).

16

*See also Dyke*, 327 F.3d at 632; *Christian v. St. Anthony Medical Center, Inc.*, 117 F.3d 1051, 1053 (7th Cir. 1997).

Thus, the elements of a disability not based on a record of or perception of impairment are as follows: (1) a physical or mental impairment, (2) that substantially limits, (3) a major life activity.  42 U.S.C. ß12102(2).  The EEOC has defined a "physical or mental impairment" as:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or
>
> (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.
>
> 29 C.F.R. ß1630.2

This definition follows the language in the regulations accompanying the Rehabilitation Act of 1977.  *Bragdon v. Abbott*, 524 U.S. 624, 632-33, 118 S.Ct. 2196, 2202-03, 141 L.Ed.2d 540 (1998); 45 C.F.R. ß84.3(j)(2)(i).  In the commentary accompanying those regulations, cancer is specifically listed as a disease which may be a physical or mental impairment under the ADA.  *Bragdon*, 524 U.S. at 633, 118 S.Ct. at 2202.

In determining whether an individual is "substantially limited," the EEOC directs the courts to consider: (i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term

17

impact, or the expected permanent or long term impact of or resulting from the impairment."  29 C.F.R. ß1630.2(j)(2).  *See also Toyota*, 534 U.S. at 196, 122 S.Ct. at 690-91.  The Supreme Court has noted that the term "'substantially' . . . suggests 'considerable' or 'to a large degree.'" *Toyota*, 534 U.S. at 197, 122 S.Ct. at 691.  *See also Albertson's, Inc. v. Kirkinburg*, 527 U.S. 555, 565, 119 S.Ct. 2162, 2168-69, 144 L.Ed.2d 518 (1999).  Accordingly, the Supreme Court held in *Toyota* that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  534 U.S. at 198, 122 S.Ct. at 691.  *See also Bragdon*, 524 U.S. at 641, 118 S.Ct. at 2206 ("The Act addresses substantial limitations on major life activities, not utter inabilities.").  Furthermore, the Supreme Court has emphasized that "[t]he impairment's impact must also be permanent or long-term." *Toyota*, 534 U.S. at 198, 122 S.Ct. at 691.

Finally, the claimed impairment must substantially limit a major life activity.  Major life activities are activities that are "of central importance to daily life" such as "walking, seeing, and hearing" and "the manual tasks in question must be central to daily life." *Toyota*, 534 U.S. at 197, 122 S.Ct. at 691.  Central to the inquiry is whether the claimant is unable "to perform the variety of tasks central to most people's daily lives." *Toyota*, 534 U.S. at 200, 122 S.Ct. at 693.

It is possible that cancer, or the treatment for cancer, can be a disability as defined by the ADA.  *See, e.g., Rauen v. United States Tobacco Manufacturing Limited Partnership*, 319 F.3d 891 (7th Cir. 2003); *Equal Employment Opportunities Commission v. Wessel, Ltd.*, 55 F.3d 1276 (7th Cir. 1995) (affirming an ADA award for disability discrimination based on an employee's cancer condition, but reversing a determination that the employee's supervisor was individually liable).  However, a person with cancer does not necessarily have a disability as defined by the ADA.  *See, e.g., Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 191 (5th Cir. 1996) (finding that a woman with breast cancer was not disabled because, although her treatment made her nauseous and tired, it did not impair her ability to do her job with an adjustment in her schedule, no special accommodations were required, and she was back to normal in three or four months); *Wyrick v. Bertalmio*, No. 99 C 4777, 2003 WL 21823544, at *13-14 (N.D. Ill. 2003) (determining that although the employee was diagnosed with breast cancer, she did not provide evidence that she suffered from a disability or that the diagnosis substantially limited a major life activity, and therefore her ADA claim failed).  In order to establish a prima facie case, Henley only claims that her cancer is a disability under subsection (A) of 42 U.S.C. ß12102(2), "a physical or mental impairment that substan-

tially limits one or more of the major life activities of such individual."[2]

However, Henley does not explain how her cancer meets the statutory definition of "disability."  Instead, she summarily states that she was disabled as the result of her treatment for cancer.  (Brief Opp. MSJ, p. 16) Given that cancer is not automatically a disabling condition under the ADA, this summary statement is insufficient to show that Henley is disabled as defined by the ADA, particularly when backed only by a reiteration of the facts regarding the effects of her cancer treatments and of the union representative's inattentiveness to her situation.  *See Ellison*, 85 F.3d at 191; *Wyrick*, 2003 WL 21823544, at *13-14.  Furthermore, based on the undisputed facts, there is no indication that Henley is disabled as defined by the ADA.

First, even assuming that Henley's cancer treatments resulted in a physical impairment, Henley does not provide any evidence that this impairment substantially limits one or more major life activities.  Henley does not demonstrate how she is substantially limited.  As to the nature and severity of the impairment, Henley testified that although the cancer treatments would cause her to feel ill and to vomit, she still could have

_____

[2] The record would not support a record of a disability or a perception of a disability.  There are only two documents in the record even indicating that Henley had cancer: (1) a doctor's note dated June 7, 2002 indicating that Henley had breast cancer and laying out her treatment plan, and (2) a doctor's note dated July 8, 2002 indicating that Henley could return to work.  (Brief Opp. MSJ, App. Exh. 5) Furthermore, Henley testified that she does not know how U.S. Steel perceived her, thus indicating that she is not arguing that she has a disability based on perception.  (Henley Dep. p. 85) ("I really don't know what U.S. Steel perceived me as.").

worked an eight hour shift.  As to the duration of her breast
cancer treatments, according to the June 7, 2002 doctor's note,
the treatments would last approximately 18 months, and Henley has
not provided any updating information on that plan.  Henley has
not indicated that the breast cancer or treatments will have any
long term or permanent impact on her.  Henley's claim that the
treatments would make her ill and vomit does not necessarily
indicate that she is impaired to a "considerable" or "large
degree."  *See Toyota*, 534 U.S. at 196, 122 S.Ct. at 690-91.
Henley has provided no further evidence or testimony that would
indicate that her cancer treatments were substantially limiting.

Furthermore, Henley does not indicate what major life
activity is affected by her cancer.  Her claims that her chemo-
therapy "stopped [her] from doing a number of daily tasks" an
that by working an eight hour shift she would have been "too
fatigued to do housework or have any recreation" do not clearly
indicate what major life activity is affected by her cancer.
(Brief Opp. MSJ, Exh. 4, ∂ 3) If Henley is asserting that her
inability to do housework after working an eight hour shift is
the major life activity that is substantially impaired, this
assertion is not supported by case law.  *See Marinelli v. City of
Erie*, 216 F.3d 354, 362-63 (3rd Cir. 2000) (holding that except
for activities that are necessary for sanitary living and "caring
for oneself," performing household chores is not considered a
major life activity).

Thus, although in some cases cancer is a disability as defined by the ADA, Henley has not shown or even claimed the necessary information for sustaining a determination that her cancer is disabling as defined by the ADA.  Consequently, by failing to show that she is disabled, Henley has not established a prima facie case under the ADA.

Furthermore, the evidence offered by Henley would satisfy only one of the two remaining requirements necessary for establishing a prima facie case.  Henley has provided some information indicating that she could perform the essential functions of her job, in particular a note from her doctor.  This evidence was not challenged by U.S. Steel.  However, Henley has failed to provide sufficient evidence that she has suffered an adverse employment decision because of her disability.

Henley argues that her discharge was based on her disability because the non-discriminatory reason provided by U.S. Steel was pretextual.  (Brief Opp. MSJ, p. 18) Although establishing that an adverse employment decision based on disability may overlap with establishing that a non-discriminatory reason offered by the employer is a pretext, Henley has failed to establish that she has a disability, and therefore she puts "the pretext cart before the prima facie horse." *Herron v. Daimlerchrysler Corp.*, 399 F.3d 293, 300 (7th Cir. 2004) (*quoting Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742, 744 (7th Cir. 2002)); *Dvorak*, 289 F.3d at 483.  Henley's argument that U.S. Steel discharged her because of her disability, regardless of whether U.S. Steel's

22

non-discriminatory reason for discharging Henley is a pretext, can stand only if Henley first establishes that she actually has a disability, which she has not done.  Therefore, summary judgment is appropriate on Henley's ADA claim.

## B.  Section 301 Claim

Henley alleges that she was wrongfully discharged by U.S. Steel and is suing both U.S. Steel and Steelworkers under LMRA ß301, claiming that Steelworker breached its duty of fair representation by acting arbitrarily in it representation.  Section 301 gives district courts jurisdiction over claims of contract violation between an employer and a labor organization, including suits brought by individual employees.  *See* 29 U.S.C. ß185(a); *Smith v. Evening News Association*, 371 U.S. 195, 200-01, 83 S.Ct. 267, 270-71, 9 L.Ed.2d 246 (1962).  Normally, an employee cannot bring a claim in district court until all grievance procedures have been exhausted.  *See Republic Steel Corporation v. Maddox*, 379 U.S. 650, 652-53, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965).  However, in some situations, such as where the union has breached its duty of fair representation, an employee may bring a claim before exhausting all grievance procedures.  *See Vaca v. Sipes*, 386 U.S. 171, 180-81, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967).  In these circumstances, the employee first must demonstrate that the union breached its duty of fair representation in order to prevail on an underlying CBA claim against either the employer or the union.  *See United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 62, 101 S.Ct. 1559, 1563-64, 67 L.Ed.2d 732, 740 (1981).  The

23

claims against the union and the employer are considered an interdependent hybrid claim, though the suit against the employer for breach of the CBA rests on Section 301, and the suit against the union rests on the union's duty of fair representation implied within the National Labor Relations Act ("NLRA"). *See DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 164-65, 103 S.Ct. 2281, 2290-91, 76 L.Ed.2d 476, 489 (1983); *Daniels v. Pipefitters' Association Local Union No. 597*, 945 F.2d 906, 920 (7th Cir. 1991). If one claim fails, the other does also. *See Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997).

A union's statutory duty to fairly represent all its employee members, both in collective bargaining and in enforcing the CBA, is part of a union's obligations as exclusive bargaining representative. *United Steel Workers of America, AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 373, 110 S.Ct. 1904, 1911, 109 L.Ed.2d 362, 375 (1990); *Vaca*, 386 U.S. at 177, 87 S.Ct. at 909-10. A union breaches its duty of fair representation when its "conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190, 87 S.Ct. at 916. *See also Air Line Pilots Association, International v. O'Neill*, 499 U.S. 65, 76, 111 S.Ct. 1127, 1134-35, 113 L.Ed.2d 51, 63 (1991). A union's actions are arbitrary only if they are "so far outside a 'wide range of reasonableness' . . . as to be irrational." *O'Neill*, 499 U.S. at 67, 111 S.Ct. at 1130 (*quoting Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686,

24

97 L.Ed. 1048 (1953)).  Furthermore, mere negligence on the part
of the union is not a breach of its duty of fair representation.
*Rawson*, 495 U.S. at 372-73, 110 S.Ct. at 1911.  The standard used
to determine whether a union's actions are arbitrary is highly
deferential and "precludes the courts from 'substituting their
own judgment for that of the union, even if, with the benefit of
hindsight, it appears that the union could have made a better
call.'" *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th
Cir. 2003) (*quoting* *Ooley v. Schwitzer Division, Household
Manufacturing, Inc.*, 961 F.2d 1293, 1302 (7th Cir. 1992)).

Henley only argues that Steelworkers acted arbitrarily, not
that the union acted discriminatorily or in bad faith.  (Brief
Opp. MSJ, pp. 9-13) According to Henley, Steelworkers acted
arbitrarily by accepting U.S. Steel's position that the merits of
the State's case against Henley were irrelevant in determining
whether her absence from work was justified.  (Brief Opp. MSJ, p.
10) Although Henley claims she is not asking this court to
substitute its judgment for that of the union, she goes to great
lengths to distinguish her criminal case from the criminal case
in the arbitration decision cited by U.S. Steel.  (Brief Opp.
MSJ, pp. 10-13) The thrust of Henley's argument is that this
court should substitute its judgment for that of the union by
reconsidering the reasoning and relevant information used by the
union in deciding not to arbitrate.  (Brief Opp. MSJ, pp. 9-10)
However, Henley offers no law in support of this argument,
perhaps because it is contrary to established Seventh Circuit

precedent.  *See Neal*, 349 F.3d at 369; *Ooley*, 961 F.2d at 1302.
Pursuant to *Neal*, this court must look to Steelworker's decision
not to arbitrate rather than reweigh the evidence before the
union.  Accordingly, the court finds that Steelworker's decision
not to arbitrate was not arbitrary.

Although Henley's criminal case may be distinguishable from
the criminal case in USS-28, 906, it certainly was within the
"wide range of reasonableness" for Steelworkers to conclude that
the case weighed against Henley such that it would not be effec-
tive to pursue arbitration.  First, in USS-28, 906 it was deter-
mined that an employee who had been incarcerated but not con-
victed was justifiably discharged, which is essentially what
happened to Henley.  Second, the factors outlined in USS-28, 906
weigh in favor of discharge when applied to Henley's case.
Henley was incarcerated for murder, had been incarcerated for
nearly two years, and had worked for U.S. Steel for only five
months before she was incarcerated.  Thus, the reason for, length
of, and term of employment prior to Henley's incarceration would
have weighed against Henley in arbitration.  Not only was it
rational, it also was reasonable and not arbitrary for Steelwork-
ers to decline to arbitrate her case.  Consequently, because
Henley does not demonstrate that the union acted arbitrarily, her
Section 301 claim against both Steelworkers and U.S. Steel for
wrongful discharge fail.

_____

For the foregoing reasons, the Motion for Summary Judgment filed by the defendant, United States Steel Corporation, on October 15, 2004 is **GRANTED**, and the Motion for Summary Judgment filed by the defendant, United Steelworkers of America, on October 6, 2004 is **GRANTED**.

ENTERED this 7th day of June, 2005

s/ ANDREW P. RODOVICH
United States Magistrate Judge

27